No. 59,988

STATE OF KANSAS, *Appellee*, v. NATHANIEL J. "YORKIE" SMITH, *Appellant.*

(781 P.2d 666)

382

Opinion filed October 27, 1989.

*Benjamin C. Wood*, former chief appellate defender, argued the cause and was on the brief for appellant.

*Nanette L. Kemmerly-Weber*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Nathaniel J. "Yorkie" Smith appeals his jury trial convictions of three counts of first-degree murder (K.S.A. 21-3401), three counts of aggravated battery (K.S.A. 21-3414), four counts of aggravated kidnapping (K.S.A. 21-3421), two counts of attempted aggravated robbery (K.S.A. 21-3301 and 21-3427), two counts of aggravated sodomy (K.S.A. 21-3506 [Ensley 1981]), one count of theft (K.S.A. 21-3701 [Ensley 1981]), and one count of unlawful possession of a firearm (K.S.A. 21-4204).

The original appeal was dismissed as having been filed out of time. In a hearing on a K.S.A. 60-1507 motion, the district court found that the filing of an untimely notice of appeal constituted ineffective assistance of counsel and granted defendant the right to appeal under K.S.A. 22-3602.

The bizarre facts may be summarized as follows. On the morning of August 20, 1982, Undersheriff Ronald Bumstead, Jr., was visiting the Allen County Fairgrounds in Iola. The fair was in progress. Some boys advised Bumstead that there was a youth sitting in the nearby Neosho River who appeared to have something the matter with him. Bumstead investigated and found fifteen-year-old Gerald Short, who had been severely beaten. Short advised that he and his companion, 17-year-old Steven Mangus, had been abducted at gunpoint from a nearby park the preceding night by a black male. They were each beaten and sodomized. Short had passed out and did not know what had become of Mangus.

Later the same day, August 20, 1982, a county employee operating a road grader northwest of Iola found the body of Steven Mangus in a rock quarry. The boy had been beaten and shot with a .22 caliber gun. While officers were at the crime scene, a call was received from an Iola car wash that the blood-splattered automobile of Iola resident Adeline Fisk was located there. Officers photographed the vehicle and it was towed to a

secure place. That evening the tow truck driver and two friends went to the general area where the Mangus body had been found looking for clues. They found the body of Adeline Fisk. That victim had also been beaten and shot with a .22 caliber gun.

The following day the tow truck driver and friends continued their investigation of the area and found the body of Tom Walsh, an Iola resident who had been missing since late July. A minimum of 156 stab wounds had been inflicted upon Mr. Walsh. Defendant was subsequently indicted and arrested for a variety of crimes relative to the four victims. Pending theft and unlawful possession of a firearm charges were consolidated with the new charges for trial. Other facts will be stated as necessary for discussion of particular issues.

On appeal the defendant raises numerous claims of error.

## FAILURE TO REVEAL EXCULPATORY EVIDENCE

In *State v. Carmichael,* 240 Kan. 149, 152, 727 P.2d 918 (1986), we discussed the prosecutorial duty to disclose exculpatory evidence as follows:

"A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is material to the guilt or innocence of the defendant. Suppression of such evidence is a violation of the defendant's Fourteenth Amendment due process rights. *Brady v. Maryland,* 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant. To justify a reversal of a conviction for failure to disclose evidence, the evidence withheld by the prosecution must be clearly exculpatory and the withholding of the evidence must be clearly prejudicial to the defendant."

In *Brady v. Maryland,* 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment."

In *United States v. Agurs,* 427 U.S. 97, 104, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976), the United States Supreme Court examined the "materiality" requirement of *Brady v. Maryland,* 373 U.S. 83, and concluded: "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial."

In *United States v. Bagley,* 473 U.S. 667, 682, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985), the court examined the standard of

materiality applicable to nondisclosed evidence in an exculpatory situation and determined as follows:

"We find the . . . formulation of the *Agurs* test for materiality sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

In the disciplinary proceeding entitled *In re Price*, 238 Kan. 426, 709 P.2d 986 (1985), we stated:

"As County Attorney of Allen County, respondent was primarily responsible for the prosecution of a sixteen-count criminal indictment against Nathaniel J. 'Yorkie' Smith. Throughout the preparation, discovery proceedings and trial of the case, respondent repeatedly failed to abide by discovery orders issued by the court, made repeated misrepresentations to the judge and defense counsel and failed to furnish statements of witnesses and other evidence to defense counsel even though under a court order to do so. During trial these matters came to light, requiring the court to declare numerous recesses and delaying the proceedings. Respondent granted immunity to a witness, Roger Smith, brother of the defendant, and failed to advise the court or reduce the agreement to writing as required by the court." 238 Kan. at 426-27.

A number of distinct incidents of withholding of evidence are asserted. Each will be discussed separately.

## 1. ROGER SMITH

Roger Smith, a key prosecution witness, is the brother of defendant. It is contended that the prosecution withheld from the defense counsel information that Roger Smith had been granted immunity from prosecution for various crimes unrelated to the crimes herein (except for the theft charge) in exchange for his testimony against defendant. There is no dispute but that such evidence was material as the witness's credibility was a major factor. In support of his claims herein, defendant states this court has already found such withholding occurred in the disciplinary proceeding previously cited. A careful reading of the statement made therein relative to immunity shows we did not find such information was withheld from defense counsel. We stated: "Respondent granted immunity to a witness, Roger Smith, brother of the defendant, and *failed to advise the court or reduce the agreement to writing as required by the court.*" *In re Price*, 238 Kan. at 426-27.

On cross-examination of Roger Smith, defense counsel asked

the witness if he had a deal with the State involving immunity if he would testify. The witness denied he did, whereupon defense counsel complained to the court as follows: "For the last two weeks, Doug, you were going to put in writing the promises of leniency that had been made to this witness, and I have not yet received them and now the witness says he was made none." Shortly thereafter, he iterated:

"Well, Your Honor, I simply have indicated to the Court that the County Attorney has informed me for the last couple of weeks that there had been some statements made to this witness with regard to leniency and so forth and that he would put those in writing and that he would give them to me . . . ."

Clearly then, defense counsel knew at least two weeks prior to his cross-examination of the witness that a deal had been made. The State's attorney then stated on the record what the deal was and defense counsel expressed no indication that this was any different than what he had been previously advised. To be doubly sure there was no discrepancy, the court had both counsel make a joint telephone call to Roger Smith's attorney, who confirmed that the State attorney's version of the agreement between counsel was correct.

We must conclude there was no withholding of exculpatory evidence from defense counsel relative to Roger Smith's immunity.

### 2. TED WITCHLEY

Defendant contends the State withheld evidence that Roger Smith and Steven Mangus had had a fight on the night of the latter's death. It is undisputed that the name of Ted Witchley, who had witnessed the fight, had been made available to defense counsel well prior to trial. Apparently, the nature of his testimony was not discussed. In any event, defense counsel interviewed Witchley shortly before the trial commenced and heard his story. Defense counsel called Witchley as a witness and carefully questioned him about the fight. Defense counsel did not request any additional time to develop this line of inquiry or to locate any possible corroborating witnesses. The prosecution should have disclosed the nature of Witchley's statement, but there is no showing of any prejudice to the defendant which could have had a reasonable probability of altering the result of the trial.

### 3. BRENDA HOUSTON

Ms. Houston was defendant's live-in girlfriend at the times pertinent herein. She testified at trial that she and defendant had target practiced with a .22 caliber pistol. Yorkie had provided the gun which he stated he had acquired from Roger Smith. Ballistics tests matched the bullets retrieved from the target practice tree with those that killed Mangus and Fisk. Law enforcement officers had interrogated Houston on numerous occasions. She was not inclined to be cooperative. On one occasion Roger Smith was wired by officials and sent to talk to Houston. In that conversation she stated that the pistol she and Yorkie had fired had come from Deannie Smith, another brother of defendant.

Defense counsel had been provided with many statements made by Brenda on different occasions. Defense counsel's inventory of documents provided to defendant by plaintiff was 40 pages long and contained some 496 different items. The Smith-Houston tape was apparently not listed and was in the possession of an officer. However, the record is clear that defense counsel learned of its contents in time to cross-examine Ms. Houston thereon. There is no showing that any request for additional time to explore this evidence was denied. We find no showing has been made that the State's failure to disclose the existence of the tape prior to trial had any reasonable probability of altering the result of the trial.

### 4. HOUSTON-CHRISTY MEETINGS

Defendant next contends that transcripts of meetings between Brenda Houston and KBI Agent David Christy were withheld from the defense until the middle of trial. Defendant alleges the transcripts showed "the KBI's strong-arm manipulative tactics."

Of the evidence turned over to defendant by the State, the following pieces of evidence are listed:

"287. K.B.I. investigation report dated December 27, 1982 by D. Christy, concerning his interview on that date of Brenda G. Houston at his motel room, # 166 at the Best Western Motel;

. . . .

"290. K.B.I. investigation report dated December 28, 1982 by D. Christy, concerning Brenda Houston showing D. Christy the tree that she and Yorkie shot at consisting of two pages;

. . . .

"295. K.B.I. investigation report dated January 18, 1983 by D. Christy, concerning an interview of Brenda G. Houston, consisting of two pages;

"296. K.B.I. investigation report dated January 18, 1983 by D. Christy, concerning the payment of $200.00 to the witness, Brenda G. Houston, in Kansas

State Buy Money because witness has no job at present time and has a small child, attached thereto is an administrative page concerning the payment to witness in the amount of $200.00, type of purchase: information, also attached thereto is a receipt signed by Brenda G. Houston, signed by David Christy, and signed by Lloyd Pappan dated January 18, 1983;

. . . .

"299. K.B.I, investigation report dated April 14, 1983 by David L. Christy, reference payment to Brenda Houston of the sum of $100.00 for information, attached thereto is a receipt signed by Brenda Houston and David L. Christy dated April 14, 1983 for $100.00 . . . ."

Defendant's cross-examination of Agent Christy centers on the meeting between him and Houston at the Best Western Motel. During that meeting Houston insinuated that Roger Smith, rather than Yorkie Smith, should be in jail and that Roger Smith was trying to set Yorkie up.

It is not clear whether Document # 287 contained a transcript of the meeting. In any case, defense counsel had a transcript of the tape which he used thoroughly and effectively in his cross-examination of Agent Christy. There is no showing of any reasonable probability that any delay in turning over the transcript altered the outcome of the trial.

### 5. PSYCHIATRIC REPORT

After trial, during an official investigation of the circumstances surrounding defendant's release from the Kansas penitentiary shortly before the crimes herein, it came to light that in his processing into the penal system defendant had been the subject of a psychiatric report. The report was made in 1976. Although the report is not before us and is not described, presumably this is the report of the examination done on all persons under sentence of commitment for felonies who are in custody at the Reception and Diagnostic Center pursuant to K.S.A. 75-5262. Defendant contends this was exculpatory evidence which should have been turned over to his counsel as it might have raised competency to stand trial or insanity defense questions.

We do not agree. The report was seven years old and hence of questionable value. Additionally, we find no duty of the prosecutor to search old convictions for psychiatric data in the possession of the Department of Corrections. Defense counsel was aware of the old conviction and the statute calling for such evaluations. We find no merit in this point.

Before closing, it should be noted that, as we stated in the *In re Price* (238 Kan. 426) disciplinary proceeding, the county attorney

did an unprofessional job in prosecuting this case. We do not retreat from that position. We find only that no reversible error has been argued herein arising from the conduct of the prosecution.

## EVIDENCE OF PRIOR CRIMES

The State introduced evidence of defendant's prior conviction for second-degree murder and two prior incidents of sodomy under K.S.A. 60-455 on the issue of identity.

Defendant contends this evidence was improperly admitted as the crimes lacked sufficient similarity to crimes on which defendant stood trial herein.

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Frank Bailey, Jr., testified that defendant had forcibly sodomized him on two occasions at the Kansas State Penitentiary. Nick Tomasic, Wyandotte County District Attorney, testified as to the facts surrounding defendant's 1974 conviction for the second-degree murder of Roosevelt Chase. Chase had been repeatedly stabbed and shot once.

Following the testimony of Bailey and following the testimony of Tomasic, the court admonished the jury that the testimony concerning the other crimes may be considered by the jury *solely* for the purpose of proving the defendant's identity and for no other purpose.

In ruling on the admissibility of such evidence, the trial court must: (1) determine it is relevant to prove one of the facts specified in the statute; (2) determine the fact is a disputed, material fact; and (3) balance the probative value of the prior crime or civil wrong evidence against its tendency to prejudice the jury. *State v. Nunn*, 244 Kan. 207, Syl. ¶ 1, 768 P.2d 268 (1988); *State v. Breazeale*, 238 Kan. 714, 719, 714 P.2d 1356, *cert. denied* 479 U.S. 846 (1986); *State v. Hanks*, 236 Kan. 524, Syl. ¶ 5, 694 P.2d 407 (1985).

Where a similar offense is offered for the purpose of proving identity, the evidence should disclose sufficient facts and cir-

cumstances of the other offense to raise a reasonable inference that the defendant committed both of the offenses. In other words, to show that the same person committed two offenses, it is not sufficient simply to show that the offenses were violations of the same or a similar statute. There should be some evidence of the underlying facts showing the manner in which the other offense was committed so as to raise a reasonable inference that the same person committed both offenses.

Without reciting herein all of the circumstances of the crimes against persons charged herein, and all of the circumstances in the evidence of the three criminal incidents admitted under K.S.A. 60-455 on the issue of identity, it is sufficient to state we have carefully examined the arguments made and facts involved and find no reversible error in the admission of such evidence.

As a subpoint under this issue, defendant contends it was error for the court not to instruct the jury that the K.S.A. 60-455 evidence could not be considered on the theft and unlawful possession of a firearm charges on which there was no issue as to identity. No contemporaneous request for such a limiting instruction was made.

The trial court should have given the instruction with a limitation that the evidence was not to be considered on the two relatively minor charges where identity was not an issue. We conclude beyond a reasonable doubt that the failure to include the limitation was harmless error as it had little, if any, likelihood of having changed the result of the trial. See *State v. Bell*, 239 Kan. 229, Syl. ¶ 3, 718 P.2d 628 (1986).

## ADELINE FISK AGGRAVATED BATTERY AND MURDER CONVICTIONS

Defendant contends that the charges of aggravated battery and first-degree murder both as to Adeline Fisk are multiplicitous.

K.S.A. 21-3107(2) provides:

"Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

. . . .

(d) a crime necessarily proved if the crime charged were proved."

Multiplicity is the charging of two or more counts in a complaint where only a single criminal act is involved. *State v. Cathey*, 241 Kan. 715, Syl. ¶ 1, 741 P.2d 738 (1987) (following *State v. Garnes*, 229 Kan. 368, 372, 624 P.2d 448 [1981]). K.S.A. 21-

3107(1) allows charging an individual with multiple violations arising from a single transaction when the same conduct may establish the commission of more than one crime.

The principles for determining whether charges are multiplicitous are: (1) a single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution; (2) if each offense charged requires proof of a fact not required in proving the other, the offenses do not merge; and (3) where offenses are committed separately and severally, at different times and at different places, they cannot be said to arise out of a single wrongful act. *State v. Cathey*, 241 Kan. at 718-19; *State v. Garnes*, 229 Kan. at 373.

In *Cathey*, we considered the multiplicity of charges of aggravated battery and attempted murder. The victim was taken from a home, then beaten and shot below the left eye. He survived the attack. Defendant was charged with and convicted of aggravated battery and attempted first-degree murder. On appeal, we reversed, finding that where there is one victim, and two acts of violence—a beating and a shooting—occur at approximately the same time and place, the person who inflicts such injuries cannot be charged with both aggravated battery and attempted murder. 241 Kan. at 719.

Multiplicity was at issue in *State v. Garnes*, 229 Kan. 368. There, the victim was shot, placed in a car, driven to a field, robbed, taken from the car, stabbed, run over by the car and left to die. Defendant was convicted of two counts of aggravated battery, one count of aggravated robbery, and one count of attempted murder. On appeal, we held that since the shooting and attempted murder were separate in time and place, they were not multiplicitous. 229 Kan. at 373. However, because the stabbing occurred contemporaneously with running over of the victim and leaving her to die, the aggravated battery by stabbing charge was multiplicitous with the charge of attempted murder. 229 Kan. at 373-74.

Both *Cathey* and *Garnes* involve claims that attempted murder and aggravated battery were duplicitous. Obviously, the victim survived—there was no charge of murder. An act of first-degree premeditated murder by means of shooting, beating, or stabbing, etc. requires proof of an aggravated battery. Had the victim

survived the charge could have been attempted murder or aggravated battery but not both. No case has been cited where a single act constituting aggravated battery has been held to constitute both aggravated battery and a homicide. Where a victim dies from an aggravated battery, a homicide has occurred and the battery merges into the homicide. Hence, where a victim of an aggravated battery dies after that charge is filed, the prosecution amends or refiles the charge as a homicide.

If the beating and shooting of Ms. Fisk had been separated by time and/or place then both an aggravated battery and a murder could have occurred.

Any separation herein would be based wholly on speculation. The victim's body was found in a field. One of her dislodged teeth was nearby. This would indicate the shooting and beating were contemporaneous. The pathologist herein testified all injuries were contemporaneous. The State relies on the blood found in and on Ms. Fisk's automobile to separate her injuries in time and place. There is no evidence that blood was spilled anywhere other than at the scene of death.

As we stated in *Cathey*:

"Where there is only one victim and two acts of violence—a beating and a shooting—occurring at approximately the same time and place, the person who inflicts such injuries cannot be charged with both aggravated battery and attempted murder. To hold otherwise would be inconsistent with our reasoning in *Garnes* that when a series of violent acts occurs simultaneously, it is multiplicitous to charge both aggravated battery and attempted first-degree murder." 241 Kan. at 719-20.

We must conclude that the aggravated battery and first-degree murder charges relative to Ms. Fisk are multiplicitous. Defendant's conviction and sentence on this aggravated battery charge should be set aside.

## SUFFICIENCY OF THE EVIDENCE

Defendant's next claim of error is that the evidence was insufficient to support his convictions of any of the crimes with which he was charged.

When the sufficiency of the evidence is challenged, the standard of review on appeal is whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Washington*, 244 Kan. 652, Syl. ¶ 1, 772 P.2d 768 (1989).

Defendant makes argument under this issue only as to two convictions—the Fisk aggravated kidnapping and the Walsh murder. As an issue not briefed on appeal is deemed abandoned, *State v. Words*, 226 Kan. 59, 63, 596 P.2d 129 (1979), we shall consider only the two convictions under this issue.

Defendant specifically contends there was no evidence of a forcible taking or confining of Ms. Fisk. K.S.A. 21-3420 defines kidnapping as "the taking or confining of any person, accompanied by force." We have carefully reviewed the record and find that the evidence, viewed in the light most favorable to the prosecution, supports the conviction beyond a reasonable doubt. Ms. Fisk's employer testified that she arrived at his house on a punctual basis in the early morning hours seven days a week to cook and do other chores for him. She was not there on the morning of August 20, 1982. The top of the screen door at the employer's home had been freshly kicked loose at the top. Ms. Fisk's car was discovered in an Iola car wash. The car had a large amount of blood on the front fender, the hood, the windshield, and the driver's door. There was blood on the inside dashboard on the passenger's side and "a little bit" on the passenger's door panel. Ms. Fisk's body was found in a field outside of Iola. Although circumstantial, there was ample evidence to convict the defendant of the aggravated kidnapping of Adeline Fisk. A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Holloman*, 240 Kan. 589, Syl. ¶ 3, 731 P.2d 294 (1987).

Likewise, we have reviewed the record carefully and find sufficient evidence to support defendant's conviction of the murder of Tom Walsh. Walsh's body was found in the general vicinity of the other bodies in this case. Underwear and boots identified as belonging to Walsh were found a few feet from Fisk's body. Walsh died of multiple stab wounds. A witness who could be found to be the last person to see Walsh alive (other than his killer) testified he saw only one car leave the area where he had left Walsh and that vehicle was similar to defendant's car. The Fisk killing was linked to the Mangus killing by the same gun being used in both. Short identified defendant as being the kidnapper of himself and Mangus.

We conclude that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational fact-finder to find the defendant guilty beyond a reasonable doubt.

## EYEWITNESS INSTRUCTION

Next, defendant contends the eyewitness identification instruction given in the case was clearly erroneous because it failed to address cross-racial identification, unconscious transference, and after-acquired experience.

Instruction No. 34, the eyewitness identification instruction, was given to the jury without objection. As there was no contemporaneous objection at trial, an appellate court may reverse only if the instruction is clearly erroneous. *State v. Patterson*, 243 Kan. 262, 268, 755 P.2d 551 (1988); *State v. Holley*, 238 Kan. 501, 506, 712 P.2d 1214 (1986); *State v. Peck*, 237 Kan. 756, Syl. ¶ 4, 703 P.2d 781 (1985). An instruction is clearly erroneous when a reviewing court reaches a firm conviction that, if the trial error had not occurred, there was a real possibility the jury would have returned a different verdict. *State v. Patterson*, 243 Kan. 262, Syl. ¶ 4.

The eyewitness instruction given was that approved in *State v. Warren*, 230 Kan. 385, 635 P.2d 1236 (1981), and is found in PIK Crim. 2d 52.20. The instruction provides:

"The law places the burden upon the state to identify the defendant. The law does not require the defendant to prove he has been wrongly identified. In weighing the reliability of eyewitness identification testimony you first should determine whether any of the following factors existed and if so the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting.
2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence.
3. Whether the witness had observed the defendant[s] on earlier occasions.
4. Whether a significant amount of time elapsed between the crime charged and any later identification.
5. Whether the witness ever failed to identify the defendant[s] or made any inconsistent identification.
6. The degree of certainty demonstrated by the witness at the time of any identification of the accused.
7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification."

In *State v. Willis*, 240 Kan. 580, 731 P.2d 287 (1987), enlargement of the list of factors was sought. In denying the requested expansion we stated:

"The seven factors contained in PIK Crim. 2d 52.20 are self-explanatory, within the scope of ordinary laymen's knowledge and judgment, and do not require expert testimony for application. The same cannot be said for the factors which defendant contends should have been added to the instruction. *These include trans-racial identification ('own-race effect'), unconscious transference, after-acquired experience, and the 'feedback' factor.* These terms are beyond the scope of ordinary laymen's knowledge and experience and would require expert testimony to be applied by a jury.

"In *State v. Warren,* the many problems involved in permitting expert testimony on the subject of eyewitness testimony were discussed at length. We then concluded:

"'After considering these cases and the literature on the subject, we have concluded that requiring trial courts to admit this type of expert evidence is not the answer to the problem. We believe that the problem can be alleviated by a proper cautionary instruction to the jury which sets forth the factors to be considered in evaluating eyewitness testimony. Such an instruction, coupled with vigorous cross-examination and persuasive argument by defense counsel dealing realistically with the shortcomings and trouble spots of the identification process, should protect the rights of the defendant and at the same time enable the courts to avoid the problems involved in the admission of expert testimony on this subject.' 230 Kan. at 395.

"We conclude that the trial court's refusal to expand the seven factors contained in PIK Crim. 2d 52.20 was not error." 240 Kan. at 585-86. (Emphasis supplied.)

We adhere to our decision in *State v. Willis* and find no error in the eyewitness identification instruction given herein.

## MANGUS AGGRAVATED KIDNAPPING CHARGE

Defendant next contends the charge of aggravated kidnapping of Steven Mangus is fatally defective for failing to allege every essential element of the offense.

K.S.A. 21-3421 provides:

"Aggravated kidnapping is kidnapping, as defined in section 21-3420, when bodily harm is inflicted upon the person kidnapped."

Count seven of the indictment against the defendant stated:

"That on or about the 20th day of August, 1982, the said Nathaniel J. 'Yorkie' Smith, within the above and within named County and State, then and there being, did then and there unlawfully, feloniously and willfully take another, to-wit: Steven Mangus, by force, with the intent to hold the said Steven Mangus to facilitate the commission of a crime or crimes, to-wit: aggravated sodomy, aggravated battery, murder, or aggravated robbery, and/or *with the intent to* inflict bodily injury to Steven Mangus or to terrorize him, *and to inflict bodily harm* on the said Steven Mangus, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State of Kansas." (Emphasis supplied.)

Defendant argues the count merely alleges that defendant *intended* to inflict bodily harm and does not allege that he *did* inflict bodily harm, thus making the charge fatally flawed. The State counters that the inappropriate wording was the result of a clerical error and that the word "to" in the phrase "and to inflict bodily harm" should have been the word, "did." The State further points to the correct language used in the aggravated kidnapping charges concerning Adeline Fisk and Gerald Short to underscore its assertion of a clerical error.

In *State v. Jackson*, 239 Kan. 463, Syl. ¶¶ 1-5, 721 P.2d 232 (1986), we discussed the rules concerning an indictment or information as follows:

"In a felony action, the indictment or information is the jurisdictional instrument upon which the accused stands trial."

"A conviction based upon an information which does not sufficiently charge the offense for which the accused is convicted is void. Failure of an information to sufficiently state an offense is a fundamental defect which can be raised at any time, even on appeal."

"If the facts alleged in an information do not constitute an offense within the terms and meaning of the statute upon which it is based, the information is fatally defective. The evidence introduced at trial to show commission of the crime sought to have been charged, and the jury instruction thereon, have no bearing on this question."

"In Kansas all crimes are statutory and the elements necessary to constitute a crime must be gathered wholly from the statute."

"An information which omits one or more of the essential elements of the crimes it attempts to charge is jurisdictionally and fatally defective, and convictions for those offenses must be reversed."

The infliction of bodily harm upon the victim is an element of aggravated kidnapping. The aggravated kidnapping charge herein made no allegation bodily harm had been inflicted. The fact the omission may have been a clerical error in no way alters the situation before us. Under our previous holdings as set forth in *State v. Jackson*, 239 Kan. 463, there is no alternative but to reverse the Mangus aggravated kidnapping conviction.

## ENHANCED SENTENCING FOR UNLAWFUL POSSESSION OF A FIREARM

The State concedes that, under *State v. Dodd*, 11 Kan. App. 2d 513, 728 P.2d 402 (1986), the trial judge improperly enhanced the defendant's sentence for unlawful possession of a firearm and that the sentence for that count must be vacated and de-

fendant resentenced. In *Dodd*, the Court of Appeals held, at Syl. ¶ 1:

"The crime of unlawful possession of a firearm (K.S.A. 21-4204[1][b]) has as a necessary element the requirement of a prior felony conviction. The Habitual Criminal Act (K.S.A. 1985 Supp. 21-4504) may not be invoked to enhance a sentence for a felony if a necessary element of the felony is a prior felony conviction."

See *State v. Turbeville*, 235 Kan. 993, 1005, 686 P.2d 138 (1984).

We conclude the trial court improperly enhanced defendant's sentence for unlawful possession of a firearm. The sentence is vacated and the case is remanded for resentencing.

## CORRECTION OF JOURNAL ENTRY

The State concedes that the journal entry on the sentencing for theft incorrectly reflects a sentence of 5-*25* years when the actual sentence imposed by the court was 5-*20* years, and that the journal entry should be corrected.

## CONCLUSION

Defendant's convictions of first-degree murder (Mangus), first-degree murder (Fisk), first-degree murder (Walsh), aggravated kidnapping (Short), aggravated kidnapping (Fisk), aggravated kidnapping (Walsh), aggravated battery (Short), aggravated battery (Mangus), aggravated sodomy (Mangus), aggravated sodomy (Short), attempted aggravated robbery (Mangus), attempted aggravated robbery (Short), theft, and unlawful possession of a firearm are affirmed.

Defendant's convictions of aggravated battery (Fisk) and aggravated kidnapping (Mangus) are reversed. The case is remanded for further proceedings consistent with this opinion.

Six, J., not participating.